IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QIANG WANG,<br><br>    Plaintiff,<br><br>  v.<br><br>PALO ALTO NETWORKS, INC.,<br>NIR ZUK, and FENGMIN GONG,<br><br>    Defendants.<br>_____/ | No. C 12-05579 WHA<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT<br>ON CLAIM FOR MISAPPROPRIATION<br>OF TRADE SECRETS UNDER THE<br>STATUTE OF LIMITATIONS** |

## INTRODUCTION

In this action alleging misappropriation of trade secrets and patent infringement, defendants move for summary judgment on plaintiff's misappropriation of trade secrets claim under the statute of limitations. For the reasons stated herein, the motion is **GRANTED**.

## STATEMENT

Plaintiff Qiang Wang is an architect and design engineer in the field of network security. From 2000 to 2012, Wang tried to commercialize his firewall technologies via ventures called GoldShield Networks and ForeSecurity. His efforts were largely unsuccessful. In 2012, after defendant Palo Alto Networks' successful initial public offering and it was sued in a patent-infringement lawsuit by Juniper Networks, Inc. (in Delaware), Wang commenced this action. Wang allegedly learned about the alleged trade secret theft via news articles covering the initial public offering and the filings in the patent litigation. Wang's theory is that his former business partner, defendant Fengmin Gong obtained his trust, learned his trade secrets, and misappropriated them for use by Palo Alto Networks.

This story begins in the early 2000s when Wang allegedly developed some firewall technologies. This included a "fast signature scan" technology. He filed a patent application thereon in November 2004. (The patent eventually issued and is asserted in the patent-infringement claim.) Wang tried to commercialize his firewall technologies through a venture called GoldShield Networks. Over the course of 2003 to 2010, Wang attempted to interest a number of venture capitalists, competitors, and entities in his technology, but his efforts never took off. This order will retrace the history so that the reader can catalog the moments when plaintiff might have been on notice that his trade secrets had been stolen for purposes of commencing the limitation period.

In February 2005, Wang met defendant Fengmin Gong at a seminar. At the time, Gong was a chief scientist at McAfee, Inc. Upon meeting Gong, Wang disclosed that he had trade secrets in the areas of "fast signature scan," "application-identification," "classification," "network security engine," and "flow management" — he did not immediately disclose his trade secrets, however (Wang Dep. at 332–34).[1]

Around the same time, defendant Nir Zuk left Juniper Networks, Inc. to form defendant Palo Alto Networks, Inc. Around May and June 2005, Zuk allegedly conceived of his own next-generation firewalls.

In April 2005, Wang and Gong entered into a non-disclosure agreement. The agreement "only applie[d] to information related to the 'fast signature scan' method discussed" and would terminate in three years. Wang never asked Gong to sign a non-disclosure agreement for any other trade secrets. Nevertheless, during the course of April to July 2005, Wang and Gong met in-person for hours on end and Wang disclosed his trade secrets. Wang also gave Gong a copy of the fast-signature scan patent application and some notes (Wang Dep. at 350–51, 358, 363–64, 481, Patchen Decl. Exh. 12). Gong was the only person who knew Wang's trade secrets.

---

[1] Deposition excerpts for Qiang Wang are appended to the declarations of Jonathan Patchen (Exhibits 1, 2) and Gabriel Opatken (Exhibit B). Excerpts of Fengmin Gong's testimony are appended to Attorney Opatken's declaration (Exhibit A) and excerpts of Nir Zuk's testimony are appended to Attorney Patchen's declaration (Exhibit 3).

2

The non-disclosure agreement stated: "Upon termination or expiration of the Agreement, or upon written request of [Qiang Wang], [Fengmin Gong] shall promptly return to [Qiang Wang] all documents and other tangible materials representing the Confidential Information and all copies thereof." *Significantly, Gong never returned any materials provided to him under the agreement — by April 2008, this was a breach* (Wang Dep. at 481–82). During oral argument, Wang's counsel were asked whether Gong ever requested a suspension or modification of this requirement of the agreement. The answer was no.

In deposition, Gong described their relationship as one of "mutual trust" (Gong Dep. at 20). Wang spoke of his trust for Gong as well. In Wang's view, they were united by their vision to "go with content security, rather than [a] traditional firewall" (Wang Dep. at 355, 387–88). Up to the point of the non-disclosure agreement (April 2005), Zuk and Palo Alto Networks had nothing to do with the case.

Two months later, in June 2005, plaintiff Wang, defendant Gong, and defendant Zuk met for one hour to discuss combining their efforts, after a referral from Greylock Partners (a venture capital firm). Wang, at the time, believed Palo Alto Networks was a "traditional firewall, conventional firewall" company. A few days later, Wang and Zuk met for breakfast. Wang testified about his discussion with Zuk:

> Q. That that [sic] was the substance of what he said about patents in that meeting?
>
> A. That is one point. He basically say patent is not very enforceable, not very useful for — if — like for me, without money, yeah.
>
> \* \* \*
>
> Q. Were you shocked because you understood him to be saying that he didn't care about infringing anyone else's patents?
>
> A. Sure.

(Wang Dep. at 25, 27, 373–75). In other words, albeit upon leading and argumentative questioning, Wang asserted that Zuk did not care whether he infringed any patents

3

(Amd. Compl. ¶ 17). Subsequent to the meeting, Gong (who would later join Palo Alto Networks) and Zuk had the following email exchange, dated June 9, 2005 (Patchen Decl. Exh. 44):

> Hi Nir,
>
> Thanks for coming to chat with us.
>
> \*  \*  \*
>
> The second thing is that . . . What would you consider to be the main thing respectively for us to win a customer over each of these players in 18 months: CISCO, Juniper, McAfee?
>
> Thanks,
>
> Fengmin

Zuk responded (ellipses in original):

> Fengmin — the answer to your second question is a big secret of Palo Alto Networks . . . Let's wait until you decide joining vs. starting your own company before we go there . . . In the meanwhile, please rest assure that both Sequoia and Greylock believe in our ability to differentiate enough vs. the big guys. As for your first question, we talked to ~ 20 customers and analysts. I will [be] more than happy to share names at the right moment.

In August 2005, Gong wrote to Wang: "Here is a copy of my non-compete agreement with McAfee. I had another discussion with him today and he confirmed to me that the company will definitely oppose my involvement with the project because of the overwhelming overlap of the scope" (Opatken Decl. Exh. D). In late 2005, Gong joined Palo Alto Networks as a chief scientist. Zuk then began introducing Gong as a "founder of Palo Alto Networks." Gong kept Wang informed of his decision to join Palo Alto Networks (Wang Dep. at 388, Patchen Decl. Exh. 51).

In January 2006, Gong urged Zuk to license Wang's technology. Gong wrote in an email, dated January 6, 2006, that he had chatted with Wang: "He has been spending some time to verify the design using a software implementation. He told me that he used ClamAV signatures to test the software. He told me that without me teaming with him, he is planning on licensing/selling that in some form." In another email, dated January 25, 2006, Gong wrote: "one arrangement could be for him to be on board for FPGA design, applying ideas from his

4

patent as appropriate. We pick up his cost for filing so far, and continue to support the application with the agreement that upon approval, we automatically get granted the license for use [sic] it" (Opatken Decl. Exhs. N, O). Zuk, however, decided not to bring in Wang.

Meanwhile, Wang continued his efforts to obtain funding for his own operation. In January 2006, Wang and a potential business partner at Rustic Canyon (venture capital firm) created a deck of slides, entitled "Integrated Network Security (INS): Technology and Competitive Landscape," wherein they listed "Palo Alto" as a player in the "multi-core processors" space. Wang wrote in an email, dated January 26, 2006, "We may want to put Tidal Networks, Palo Alto Networks, . . . into the table" (Patchen Decl. Exhs. 25, 31) (ellipses in original). In other words, as early as January 2006, Wang was monitoring Palo Alto Networks as a competitor.

In March 2006, when negotiating with Rustic Canyon regarding valuation of his own venture, Wang stated: "Approach III: compare to other recent deals in the *same space* Palo Alto Networks' valuation for the first round funding of $9.5M is over $9M" (Patchen Decl. Exh. 38) (emphasis added). In a follow-on email, dated March 15, 2006, Wang stated: "I believe that Palo Alto Networks didn't do any development work before the first round funding of $9.5M, while we have put man-years work at this point." Wang never reached a deal with Rustic Canyon and his potential business partner bowed out in March 2006.

In June 2006, Zuk, Gong, and two others filed the patent application which would become U.S. Patent No. 8,009,566 (the "'566 patent"). The '566 patent is the basis for Wang's correction-of-inventorship claim.

In June 2007, Palo Alto Networks announced on its website the sale of its first commercial product — "Palo Alto Networks has created a next generation firewall that takes an application-centric approach to traffic classification to enable unmatched application visibility and policy control." "Based on App-ID$^{TM}$, our revolutionary application classification technology, the PA-4000 Series identifies and controls applications." The PA-4000 Series is based on "Palo Alto Networks' patent pending App-ID$^{TM}$ application classification technology"

(Igoe Decl. Exh. 5 at 8–13). After serving as a chief scientist for Palo Alto Networks for more than a year, Gong was pushed out in August 2007.

*In December 2007, the application for the '566 patent was published.* (The application was granted in August 2011). The patent application identified the inventors as defendant Nir Zuk, defendant Fengmin Gong, Song Wang, and Siu-Wang Leung. Plaintiff Qiang Wang was not a named inventor on the face of the '566 patent or patent application. Once the publication was published, it was publicly available to all. It was in the same field as Wang's still-pending application. Wang contends that defendants misappropriated or misused his trade secrets by including them in the patent application that became the '566 patent (Patchen Decl. Exh. 8–10). The publication of the '566 patent application in December 2007 was a key event for our statute of limitation purposes.

In February 2008, Gong informed Wang that he left Palo Alto Networks "last August" and was working at FireEye, Inc. (Opatken Decl. Exh. X). Gong thereafter joined Huawei Symantec Technologies Co., Ltd. Gong offered (in 2010) to help Wang license or sell his technology to Huawei Symantec. The negotiations fell through, to their disappointment (Wang Dep. at 464, Opatken Decl. Exh. EE).

In November 2008, Wang's fast-signature scan patent, U.S. Patent No. 7,454,418, issued. This is the basis for Wang's patent-infringement claim.

From 2007 to 2009, press releases, events, whitepapers, and other news were publicly available on Palo Alto Networks' website. The media, including The New York Times, Forbes, Information Security Magazine, Network World, VentureBeat, Dark Reading, eWeek, Information Week, Dow Jones VentureWire, SC Magazine, CRN Magazine, and ZDNet, reported on Palo Alto Networks and its products (Igoe Decl. Exhs. 5–26).

In December 2011, Juniper Networks (Zuk's former employer) filed a patent-infringement lawsuit against Palo Alto Networks. *Juniper Networks, Inc. v. Palo Alto Networks, Inc.*, No. 1:11-cv-01258-SLR (D. Del. Dec. 19, 2011) (Judge Sue Robinson). In August 2012, Wang allegedly learned about the '566 patent from reading the briefs filed therein (Wang Dep. at 474).

6

In July 2012, Palo Alto Networks held a successful initial public offering. Wang testified in deposition that he had thought Palo Alto Networks was a "conventional" firewall company and did not learn that they had become a "content security appliance" company until their initial public offering (Wang Dep. at 282). His emails reveal otherwise.

Wang soon after reached out to Acacia Research Group in an email, dated July 29, 2012:

> Last week Palo Alto Networks (PANW) had a great IPO with a market cap of $4B. What makes Palo Alto Networks so "hot" is its\ next-generation Firewalls with Application ID and Content ID, which is basically adding content scanning into current Firewall. I was so excite bout [sic] the market opportunity. Could you please let me know 1) if Acacia could be interesting [sic] in helping me to enforce my patents and 2) what is a typical deal in terms of percentage of net recovery, up-front cash payment, etc.?

(Patchen Decl. Exh. 22). This was a follow-on solicitation to Wang's initial effort to reach out to Intellectual Ventures and Acacia Research Group in January 2011 (Patchen Decl. Exhs. 24, 29). Wang commenced this action in October 2012.

In sum, summary judgment is appropriate because it is undisputed that (1) Wang practiced in the field of network security, filed his own patent application in 2004, and spent the better part of a decade trying to commercialize and license his technology, (2) Wang disclosed all of his alleged trade secrets to Gong by 2006, (3) Wang knew Gong joined Palo Alto Networks, a known competitor, in 2006, (4) the '566 patent application (by Zuk, Gong, and two others) was published in December 2007 and disclosed at least some of the alleged trade secrets (the application was filed in June 2006 and granted in August 2011), (5) Gong breached the non-disclosure agreement in April 2008 by failing to return the confidential materials — by this time, the alleged misappropriation which took place in 2006 had already occurred, and (6) this action was filed in October 2012, more than three years later, after a litany of information about Palo Alto Networks' "patent-pending" "next-generation firewalls" were in the public domain.

\*          \*          \*

In October 2012, Wang filed this lawsuit against Gong, Zuk, and Palo Alto Networks. The ten-page complaint identified two claims for relief: (1) correction of inventorship and (2) misappropriation of trade secrets. The complaint did not plead patent infringement. The complaint alleged that on "November 7, 2003, Wang applied for a patent on a revolutionary

7

fast content scan technology, the foundation of these technologies, and that application eventually issued as U.S. Patent No. 7,454,418" in November 2008 (Compl. ¶ 9). Wang alleged that based on reading articles following Palo Alto Network's initial public offering, he (*id*. ¶ 20):

> discovered the existence of the '566 patent (issued August 30, 2011), which Gong, Zuk and two other [Palo Alto Networks] employees had applied for on June 26, 2006. In the original application, Zuk and Gong were listed as the first and second inventors.

Wang alleged that the '566 patent is "based at least in part on (if not completely based on) Wang's trade secrets" (*id*. ¶ 30). At our hearing, counsel for plaintiff admitted that the alleged trade secrets were extinguished by the issuance of the patent to the extent disclosed in his own patent.

For months in this litigation, Wang rested on Palo Alto Networks' patent application for the '566 patent as his main evidence of the alleged misappropriation. In an interrogatory response served in March 2013, Wang stated:

> *Defendants misappropriated or misused the trade secrets by including them in their patent application which issued as U.S. Patent No. [8],009,566 ("the '566 Patent"). The specific examples are detailed in Plaintiff's Response to Interrogatory No. 6. Defendants also likely misappropriated or misused the trade secrets in designing and development of the functionality and features of PAN's products, and the solicitation of investments for such development. Absent discovery, however, Plaintiff cannot point to specific instances of such misappropriation or misuse, inasmuch as Defendants conducted such design, development and solicitation in secret.*

(Patchen Decl. Exh. 8) (emphasis added). Again, the application for the '566 patent was published in December 2007. It was not until September 2013 that Wang supplemented his response to identify products allegedly incorporating the misappropriated secrets.

More than seven months after filing his original complaint, in June 2013, Wang sought leave to amend his complaint — to add for the first time, patent-infringement and

8

1  breach-of-contract claims. The patent-infringement claim was added and the case schedule was
2  extended (Dkt. Nos. 85, 86, 88).[2]
3          This order follows full briefing and oral argument on April 10. On April 4, plaintiff
4  Wang filed a "motion to strike expert report of Vern Paxson and belated production of associated
5  documents," noticed for May 22 (Dkt. No. 156). On April 9, Wang filed a motion to modify the
6  case management order to reopen discovery on "PAN's destruction of source code and related
7  issues," noticed for May 22 (Dkt. No. 164). Trial is scheduled for July 7, 2014.

**ANALYSIS**

California Code of Civil Procedure Section 3426.6 states (emphasis added):

> An action for misappropriation must be brought *within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered*. For the purposes of this section, a continuing misappropriation constitutes a single claim.

In other words, "when the statute of limitations begins to run on some of a plaintiff's trade secret claims against given defendants, the statute also begins to run at that same time as to other trade secret claims against those same defendants, even if there have not yet been any acts of misappropriation of the other trade secrets." *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 657 (N.D. Cal. 1993) (Judge Wayne Brazil). When the limitations period would have otherwise commenced, plaintiff has the burden to prove the facts necessary to toll the limitations period. *California Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995). "[P]laintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 807–08 (Cal. 2005). The statute of limitations begins to run when there is actual or constructive notice of a claim.

---

[2] One might well ask what claims for misappropriation of trade secrets could possibly persist since counsel admitted that the trade secrets disclosed to the PTO in Wang's own patent application were extinguished by 2008 when Wang's patent issued. This question was asked at the hearing. Counsel for Wang replied: "it was those trade secrets that enabled [Palo Alto Networks] to get off the ground. And [to] get to market in 2007 with — with a product that was — helped them survive." Counsel for Wang continued: "it was that engine that helped this company get off the ground . . . The trade secret claim is much more valuable and broader" (Apr. 10, 2014 Hr'g. Tr. at 19–20).

9

"While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper." *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1112 (Cal. 1988). Individuals, even with a fiduciary relationship, cannot sit idly by when facts would sufficiently raise suspicion in a reasonable person. *Czajkowski v. Haskell & White, LLP*, 208 Cal. App. 4th 166, 176–77 (Cal. Ct. App. 2012). The United States Supreme Court has stated that issuance of patents and recordation with the PTO constitute notice to the world of their existence. *Sontag Chain Stores Co. Ltd. v. Nat'l Nut Co. of California*, 310 U.S. 281, 295 (1940) (dictum).

      In situations much like ours, other district judges have found misappropriation claims time-barred. In *Micrel Inc. v. Monolithic Power Sys., Inc.*, No. 3:04-cv-04770-JSW, 2005 WL 6426678, at *5–6 (N.D. Cal. Dec. 9, 2005) (Judge Jeffrey White), the misappropriation-of-trade-secrets claim was time-barred because issuance of the patent gave plaintiff constructive notice of the claim and plaintiff knew defendant left under false pretenses to form a competing company. In *Alamar Biosciences Inc. v. Difco Labs. Inc.*, No. 2:94-cv-01856-DFL-PAN, 1996 WL 648286, at *5–6 (E.D. Cal. Feb. 27, 1996) (Judge David Levi), the misappropriation-of-trade-secrets claim was time-barred because plaintiff strongly suspected defendant of having misappropriated trade secrets and a search using relevant terms would have revealed the existence of the patent application within ten minutes. Plaintiff was familiar with the patent search procedure, and "[i]n these circumstances, a reasonable plaintiff is required to take the elementary steps of checking all readily available patent applications." In *Memry Corp. v. Kentucky Oil Technology, N.V.*, No. 5:04-cv-03843-RMW, 2007 WL 2746736, at *9 (N.D. Cal. Sept. 20, 2007) (Judge Ronald Whyte), the misappropriation-of-trade-secrets claim was time-barred because no reasonable juror could have concluded that the plaintiff was unaware of defendants' plan to claim the invention in their patent application. In *Gabriel Technologies Corp. v. Qualcomm Inc.*, 857 F. Supp. 2d 997, 1004–07 (S.D. Cal. 2012) (Judge Anthony Battaglia), the misappropriation-of-trade-secrets claim was time-barred because there was an email indicating suspicion about a "direct rip-off"

10

1 and multiple patent applications containing the alleged trade secrets were published more
2 than three years before the claim was filed. In *WesternGeco v. Ion Geophysical Corp.*,
3 No. 09-cv-1827, 2009 WL 3497123, at *4–5 (S.D. Tex. Oct. 28, 2009) (Judge Keith Ellison),
4 a breach-of-contract claim was time-barred by the publication of the patent application which
5 constituted constructive notice of the breach triggering the limitations clock. The court held
6 (*id*. at *4):

> A person is charged with constructive notice of the actual knowledge that could have been acquired by examining public records . . . . In the same way that the issuance of a patent by the PTO constitutes notice to the entire world of its existence, regardless of whether other persons take it upon themselves to examine the records, so too, by extension, do the applications published under the [Patent Cooperation Treaty] constitute notice to the world of their existence, that is, notice of the specific technologies to which the applicants lay claim.

Our accused wrongdoers filed their patent application disclosing the alleged trade secrets in June 2006. It was published in December 2007. By April 2008, Gong was in violation of his agreement with Wang to return the documents disclosing the trade secrets. This action was commenced in October 2012. This order holds that Wang's misappropriation of trade secrets claim is time-barred. There are three independent reasons.

*First*, this order holds that an inventor actively practicing in the field and prosecuting his own patent application must be deemed to be on constructive notice of published patent applications in the same field. Here, when the application for the '566 patent was published in December 2007, Wang was already prosecuting his own patent application in the same field, not to mention, trying to commercialize his own technologies and looking for potential business partners, investors, and licensees. The '566 patent application undisputedly revealed the alleged trade secrets sued on (or at least some of them). Wang so admitted in his deposition: "And I search Palo Alto Networks' patent application and I see everything in — pretty much everything in the patent application is already covered by my trading [sic] secret" (Wang Dep. at 474).

11

Counsel confirmed:

> The Court: If [Wang] had read it. He would have known immediately that Gong had betrayed him. You deny that?
>
> Mr. Vickrey: I don't deny that Your Honor.

(Apr. 10, 2014 Hr'g. Tr. at 12).

In 1936, the Supreme Court said (in a dictum): "[t]he parties agree that issuance of a patent and recordation in the Patent Office constitute notice to the world of its existence." *Wine Ry. Appliance Co. v. Enter. Ry. Equip. Co.*, 297 U.S. 387, 393 (1936). The *Sontag* decision was even stronger: "Constructive notice of their existence goes thus to all the world." 310 U.S. at 295. The undersigned judge has declined in the past to treat this dictum as a ringing universal rule of law for purposes of commencing a limitations period, *see Applera Corp.-Applied Biosystems Grp. v. Illumina, Inc.*, No. 3:07-cv-02845-WHA, 2008 WL 927963, at *1 (N.D. Cal. Apr. 4, 2008), but surely publication of patents (and now patent applications) must be deemed, as a matter of law, to place those practicing in the same field and prosecuting their own patent applications in the same field on full notice of all of the contents of the publication. Even if in some cases, there might still be an issue whether such notice should have caused a reasonable person to sue, it is crystal clear here that the contents of the '566 patent application revealed the alleged trade secrets in question. Thus, as a matter of law, plaintiff's trade secrets claim was time-barred well before the instant action was commenced. This alone is dispositive.

The Court is unpersuaded by the decisions cited by Wang. In *General Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1398–99 (9th Cir. 1991), our court of appeals reversed a grant of summary judgment because genuine issues of material fact remained over constructive notice. It was not clear that a reasonable person would have investigated the relevant patent because the individual alleged to have misappropriated the trade secrets was not listed on the face of the patent. There was also no evidence that plaintiff saw the advertisements allegedly providing constructive notice, especially since they were placed under a different trademark and plaintiff was not expected to connect the advertisement to defendants.

By contrast here, Gong and Zuk's names were listed on the face of the '566 patent application published in December 2007. Wang knew Gong and Zuk were spearheading

12

the Palo Alto Networks effort — an effort in the same space, and news stories about the "next-generation firewall" products were displayed all over the Palo Alto Networks' website and in popular media channels. Wang must be presumed to have been monitoring patent applications in his own field, for at the time, he was prosecuting his own patent application with the PTO, looking for potential business collaborations, and trying to commercialize and license his technologies.

\*            \*            \*

*Second*, in April 2008, Gong breached the non-disclosure agreement when he violated his agreement to return the documents containing Wang's alleged trade secrets. This is undisputed. Wang knew, moreover, that Gong had gone to work at Palo Alto Networks and was employed in the field of network security. Wang knew that Gong had never asked for relief from his duty to return the trade secrets. This violation involving the trade secrets put Wang on inquiry notice. This too is dispositive in and of itself.

\*            \*            \*

*Third*, as yet another stand-alone independent ground, it is critical to remember that the complaint was filed more than three years after the fact and thus the burden is on plaintiff to show the new facts that came to light in the three-year period before suit. Wang has failed to meet this burden, for the two "new facts" urged by him were known to Wang more than three years before suit.

*Alleged New Fact # 1*: Wang argues that he discovered in 2012 that Palo Alto Networks was pursuing "content-based" firewall products as opposed to "conventional" firewall products. In other words, Wang argues that he somehow believed until 2012 that the accused new venture was based on old technology.

It is impossible to believe this story and no reasonable jury could believe it. There were a wealth of discovery admissions that Wang knew many years earlier that Palo Alto Networks was pursuing more advanced products, including content-based firewalls. In an email from Wang to Zuk, dated June 2005, Wang asked about the "NFA-DFA algorithm and implementation [Zuk] talked about" and whether the algorithm was "dependent on the number of bytes, the number of

signatures, and the complexity (wildcards * and ?, or range, etc.) of signatures" (Patchen Decl. Exh. 43). This was the very type of new technology Wang was also pursuing. In another email from Wang to a then-business partner, dated January 2006, Wang stated that their slides canvassing the competitors in the industry should include Palo Alto Networks (*id*. at Exh. 25). The slides were modified, per Wang's request, to call out Palo Alto Networks as a competitor in "next-generation approaches" to integrated network security and unified threat management (*id*. at Exhs. 30, 31). Significantly, Wang testified that signature-scanning algorithms and unified threat management approaches were for content-based, not conventional, firewalls (Wang Dep. at 22–24, 289–90). In an email from Wang to a venture capital firm, dated March 2006, Wang compared his effort to "other recent deals in the same space[,] Palo Alto Networks" (Patchen Decl. Exh. 38). These are all Wang's own admissions and writings. In short, Wang knew Palo Alto Networks was pursuing content-based firewall products on or before 2006.[3]

*Alleged New Fact # 2*: At oral argument, counsel repeatedly referred to discovering Gong's "lie" when he read the opposition brief Palo Alto Networks filed in March 2012 in the *Juniper Networks* action. Palo Alto Networks' brief had stated:

> *By November and December of 2005, Mr. Zuk and three others had developed a detailed business plan and architectural schema for this technology* — as evidenced by two presentations developed by PAN to obtain financing for its work. Zuk Decl. Exs. A, B. Notably, both presentations expressly list as PAN founders four individuals: Mr. Zuk (CTO), Dave Stevens (President and CEO), Gerhard Eshelbeck (VP, Engineering), and *Fengmin Gong (Chief Scientist)*. As a result of this round of financing, PAN obtained more than $9 million.

(Opatken Decl. Exh. GG at 3) (emphasis added). The alleged lie was that Gong told Wang in December 2005 that he was going to Palo Alto Networks when he actually had an offer letter in November 2005, a month earlier. Wang testified that Gong told him in December 2005, "[u]nless we can find funding immediately — immediately, to me, pretty much in next few weeks, and he cannot work with me anymore and have to go to Palo Alto Network (Wang Dep.

---

[3] This paragraph relies only on Wang's admissions and writings. It is unnecessary to wade through all of the publicly available web-pages and public notices explaining the product lines of Palo Alto Networks.

1  at 339–40, 388, Opatken Decl. Exh. L). The difference, if any, between November 2005
2  and December 2005 does not and cannot explain the long delay in commencing this action.
3  Earlier in April 2005, Wang had disclosed his trade secrets to Gong and they had tried to design
4  a plan to commercialize them. By the end of the year, Gong was out of work and needed a job
5  and told Wang he would be at Palo Alto Networks unless Wang could get his funding right
6  away. Whatever minor inaccuracy raised from their conversation (and it is hard to see any
7  inaccuracy) had nothing to do with the substance of this case.

8      In sum, plaintiff has not carried his burden to identify any "new fact" that came to his
9  attention in the three years preceding suit so as to justify the delay. This, too, is dispositive.

10     Wang attempts to find safe harbor in *Brocade Communications Systems, Inc. v. A10*
11 *Networks, Inc.*, 873 F. Supp. 2d 1192, 1217 (N.D. Cal. 2012) (Judge Lucy Koh), and *UniRAM*
12 *Technology, Inc. v. Taiwan Semiconductor Manufacturing Co.*, 617 F. Supp. 2d 938, 946–48
13 (N.D. Cal. 2007) (Judge Vaughn Walker). In *Brocade*, Judge Koh found that a jury could
14 reasonably infer from the evidence that plaintiff was not on notice to inquire further because
15 executives were not concerned with the employee departures and viewed the relevant product
16 as non-competitive when it was first introduced. In *UniRAM*, Judge Walker reviewed four
17 documents for which plaintiff responded with plausible alternatives raising credibility
18 determinations and genuine disputes of material fact. For example, there was no reason to be
19 suspicious about the patent-threat letter because the patent was not issued to defendant and
20 plaintiff was free to believe that the similar product was independently developed. Unlike in
21 *UniRam* and *Brocade*, the patent application disclosing at least some of the alleged trade secrets
22 here in question was published in 2007 and Gong undisputedly breached the non-disclosure
23 agreement in 2008.

24     Our situation is also unlike that in *Hawthorne v. Umpqua Bank*, No. 11-cv-06700-JST,
25 2014 WL 295499, at *4 (N.D. Cal. Jan. 26, 2014) (Judge Jon Tigar). In *Hawthorne*, a motion
26 for leave to file a third amended class action complaint alleging unfair competition and fraud
27 claims was granted. Here, this is summary judgment wherein both sides have taken discovery
28

15

and proffered evidence. No reasonable jury could find that Wang's trade-secrets claim is not time-barred.

## CONCLUSION

For the three independent reasons stated herein, the motion for summary judgment on the claim for misappropriation of trade secrets (second claim for relief) is **GRANTED**.

**IT IS SO ORDERED.**

Dated: April 11, 2014.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE